IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 18-291-03 |
| JETHRO RICHARDSON | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Jethro Richardson seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the fact that he was convicted of committing an extensive fraud, that he still presents a risk that he will engage in other financial crimes, that he has served only 20 months of his 70-month sentence (approximately 29%), and that the defendant does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic.

**I.    Background.**

    **A.    Criminal Conduct.**

From at least June 2016 until July 2018, the defendant played an important role in a nationwide scheme to defraud Walmart and a number of banks, by passing hundreds of thousands of dollars' worth of counterfeit checks. Along with eight other co-conspirators, Richardson obtained the identities of innocent persons, then travelled throughout the United States, going from store to store, presenting over $1,000,000 in counterfeit checks. On December 11, 2018, a grand jury returned a superseding indictment charging

Richardson and eight others with conspiracy to commit wire fraud and utter counterfeit securities, in violation of 18 U.S.C. § 371; three counts of wire fraud and aiding and abetting, in violation of 18 U.S.C. § 1343; and aggravated identity theft, in violation of 18 U.S.C. § 1028A. On March 20, 2019, Richardson entered pleas of guilty to Count 1, charging conspiracy; Counts 2 through 4, charging wire fraud and aiding and abetting; and Count 12, charging aggravated identity theft.

This Court sentenced Richardson on July 23, 2019. The Presentence Report ("PSR") described him as a 40-year-old man born in Ohio, who lived in Greensboro, North Carolina at the time of the fraud scheme. PSR p. 3. The PSR stated further that in 1999, Richardson had been diagnosed with a progressive autoimmune disorder, and began an antiviral treatment regimen. PSR ¶ 90. Richardson told the probation officer that he continued to take his antiviral medication, and that his autoimmune disorder was presently undetectable by laboratory testing. *Id.* Richardson reported that in addition to his autoimmune disorder, he had hypertension, which was not medicated. *Id.*

The PSR calculated Richardson's advisory sentencing guideline range as a base offense level of 7; 14 offense levels were added per § 2B1.1(b)(1)(H), based on an amount of loss between $550,000 and $1,500,000; and the offense involved 10 or more victims, including Walmart, which increased the offense level further by 2 levels, to 23, per § 2B1.1(b)(2)(A)(i). Three levels were subtracted for acceptance of responsibility per § 3E1.1(a) and (b), for a total offense level of 20. PSR ¶ 67. The defendant had two prior convictions, one for larceny at age 18, and the second for possession of a controlled substance with intent to deliver when he was 34, yielding three criminal history points,

and committed the charged crimes while on supervision for the drug felony, PSR ¶ 72, all of which placed him in Criminal History Category III. PSR ¶¶ 69-73. Thus Richardson faced a recommended Sentencing Guidelines range of 41 to 51 months in prison, to which was added a statutory mandatory minimum sentence of two years in prison, for an effective guidelines range of 65 to 75 months in prison. PSR ¶ 106. This Court sentenced Richardson to a term of imprisonment of 70 months, in the middle of the guideline range.

The defendant is serving his sentence at FCI Butner Medium I, with an anticipated release date of July 11, 2024. He has served approximately 18 months, and has credit for good conduct time of approximately two months, for total time served of approximately 20 months. He has not committed any disciplinary infraction during his time in custody.

### B.    Request for Compassionate Release.

On May 8, 2020, the defendant submitted a request for compassionate release to the warden. The request was based on the following medical conditions: being HIV positive, sickle cell, high blood pressure (hypertension), and anxiety, as well as the risk presented should the defendant contract COVID-19. The warden denied this request. On January 4, 2021, the defendant, through appointed counsel, submitted a motion to this Court for compassionate release, based upon Richardson's being HIV positive, having hypertension and anxiety, and being a carrier of the sickle cell trait. ECF 262, p. 2 ¶ 4.

The undersigned obtained the medical records of the defendant for the past year from BOP, and provided a copy to defense counsel. The records, filed under seal as Exhibit A, reveal that the defendant, who is 42 years old, presents as HIV positive, with hypertension, anxiety, depression, and insomnia. Further, he carries the sickle cell trait.

Since 1999, the defendant's HIV has been asymptomatic; he has never had an HIV-related illness. Indeed, except for his hypertension, which has not been well-controlled for years, all of the above conditions appear well-controlled at this time with medication provided by the institution. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs).

      C.      **BOP's Response to the COVID-19 Pandemic.**

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

This office does not oppose compassionate release based on the current status of an institution in mitigating the spread of the virus. Even if the situation at a particular prison appears under control at the moment, we recognize that the virus is pernicious and may rapidly spread in a prison environment at any time. Therefore, our focus is on whether an inmate is at greater risk of an adverse outcome were he to contract the disease, and if so, whether consideration of all sentencing factors nevertheless warrants continued confinement.

However, it is reassuring, and we advise for the information of the Court, that BOP has had success at many institutions in limiting the spread of the virus, and also in stemming outbreaks when they occur. BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined, and not released into the general population until the passage of 14 days and

return of a negative test; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[1] This action, combined with the reduced number of new arrivals during the pandemic, and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, designed to increase the possibility of social distancing and reduce the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% smaller, at the lowest level in decades.

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

Specifically as it relates to the defendant, BOP's aggressive efforts have extended to FCI Butner Medium I. That institution houses 701 inmates (557 at the FCI and 144 at the Camp). There was a large outbreak at this facility soon after the onset of the pandemic; tragically, nine inmates died from the disease during April and May. Through extensive mitigation and quarantine efforts, the situation was brought under control. At present, there are two inmates who are reported positive, and are isolated while they are treated/recover. There are also 165 current inmates who previously tested positive and have recovered. The latest statistics are available at www.bop.gov/coronavirus.

## II. Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

>    (i)   extraordinary and compelling reasons warrant such a reason . . .
>
>    and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

---

[2] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   Medical Condition of the Defendant.—
>
>     (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii)   The defendant is—
>
>         (I)   suffering from a serious physical or medical condition,
>
>         (II)   suffering from a serious functional or cognitive impairment, or
>
>         (III)   experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

 (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

 (C) Family Circumstances.—

  (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

  (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

 (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release,

especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). *See also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

However, the government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of

exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 2020 WL 1627331, at *20 (W.D. Pa. May 29, 2020)).

The CDC's list of risk factors was most recently updated, based on the latest data, on December 23, 2020. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that certainly present a risk, with a separate list of conditions regarding which there is insufficient data to conclude anything other than that these conditions "might" put a person at risk. Therefore, inmates with conditions on the latter list do not present an extraordinary basis for relief. "Given the lack of data and certainty regarding this second group of conditions, the fact that Defendant has a condition that may increase his risk for severe illness from COVID-19, without more, does not present an 'extraordinary and compelling reason' under the compassionate release statute and U.S.S.G. § 1B1.13." *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020). *See also United States v. Hill*, 2020 WL 6202322, at *3 (E.D. Pa. Oct. 22, 2020) (Schmehl, J.) (court does not consider a condition in the "might" category); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension."); *United States v. Alejo*, 2020 WL 6122528, at *1 (S.D. Ga. Oct. 16, 2020) ("at this point, the Court cannot conclude that the "might" category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself.").

Here, the defendant is not eligible for compassionate release because he has not pointed to any condition that he currently has that is on the CDC's list of certain risk factors. While Richardson is HIV-positive, with hypertension, anxiety, depression, and insomnia, and carries the sickle cell trait, of those conditions, only hypertension is on the CDC's list of conditions that "might" put a person at risk. While sickle cell anemia disease is on the list of certain risk factors, fortunately Richardson only carries the sickle cell trait, which is different and not a certain risk factor. Being HIV positive, when the person is on an effective HIV treatment regimen, is neither a certain risk factor nor a condition that might put a person at risk. In addition, anxiety, depression, and insomnia are other chronic conditions that are not on either list.

Richardson presents the condition of being HIV positive. He takes Abacavir-Dolutegravir-Lamivud, which is a fixed-dose combination of antiretroviral medications, to treat HIV. Exhibit A, 392-396. Until recently, his viral load was undetectable, and he has never had an HIV-related illness. Exhibit A, 289, 294. The CDC has stated that people who are on an effective HIV treatment have the same risk for COVID-19 as people who do not have HIV; the CDC states further that while there may be a chance of a worse outcome if the person's CD4+ (T cell) count is low, there are insufficient data at this time to draw a definite conclusion. *See* What to Know About HIV and COVID-19 (July 28, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html. In any event, Richardson's medical records do not show a low CD4+ count, *e.g.*, Exhibit A, 1, 2, 6 ("infection well controlled with high CD4 count"), 337, 345, and he does not claim otherwise. This condition therefore is not an

extraordinary basis for relief. *See, e.g.*, *United States v. Esmond*, 2020 WL 4915669, at *2 (D.N.J. Aug. 21, 2020) (HIV is not an extraordinary circumstance where the inmate is asymptomatic and the CD4 count is stable).

While sickle cell anemia disease is on the CDC's list, having "sickle cell trait"—which is what Richardson's counseled motion avers, and what his medical records all record him as having, *see* Ex. A, at 6, 41, 46, 54, 59, 169, 199, 288—is not a condition on the CDC's risk list. *See United States v. Thomas*, 2020 WL 4917730, at *4 (C.D. Ill. Aug. 21, 2020) ("Sickle cell disease is not synonymous with sickle cell trait. Unlike sickle cell disease, a serious illness in which patients have two genes that cause the production of abnormal hemoglobin . . . individuals with sickle cell trait carry only one defective gene and typically live normal lives"). The defendant has not been diagnosed with sickle cell anemia, and his medical records listing that he has sickle cell trait does not qualify as a health condition that falls on the CDC's risk list for COVID-19. *See also* Ex. A, at 6, 41, 46, 54, 59, 169, 199, 288 (indicating Richardson has sickle cell trait but not sickle cell anemia disease).

The defendant's medical records show that he has hypertension. When this Court sentenced Richardson, this condition was not medicated. PSR ¶ 90. At the institution, the defendant has been prescribed and currently takes three medications to treat his hypertension.[3] His blood pressure is measured weekly. Exhibit A, 266. Unfortunately,

---

[3] He takes Amlodipine, 10 mg., a calcium channel blocker; Chlorthalidone, 25 mg., a water pill; and Lisinopril, 40 mg., an ACE inhibitor used to relax blood vessels. Exhibit A, 392-396.

even with medication, his hypertension is not well-controlled, with recent elevated blood pressure readings of 136/86 in January 2021 and 137/87 and 149/93 in December 2020, Exhibit A, 352. The medical records show a pattern of initially elevated blood pressure readings, followed by lower readings, within normal limits, once the defendant sits and talks with the doctor. *E.g.*, Exhibit A, 266, 289. In any event, in the CDC's latest assessment of risk factors that place a person at a greater risk of a severe outcome from COVID-19, hypertension is listed as a condition that "might" cause a serious outcome; the CDC states there are insufficient data to draw a conclusion.

A vast number of courts have accordingly denied relief in recent months when hypertension is the only putative risk factor presented. *See, e.g.*, *United States v. Nesbitt*, 2020 WL 3412577, at *4 (E.D. Pa. June 22, 2020) (Bartle, J.) (ordinary hypertension does not justify release); *United States v. Daniels*, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (Schiller, J.) (same); *United States v. Tartaglione*, 2020 WL 3969778, at *6 (E.D. Pa. July 14, 2020) (Slomsky, J.) (hypertension and hyperthyroidism, if presented by 64-year-old, "are not the kind of conditions that place her at a uniquely high risk of grave illness or death if infected by COVID-19."); *United States v. Williams*, 2020 WL 4756738, at *5 (E.D. Pa. Aug. 17, 2020) (Pratter, J.) ("Although the CDC recognizes that having certain other conditions, including hypertension or high blood pressure 'might be at an increased risk,' hypertension is not considered high risk at this time."); *United States v. Ackerman*, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) (Marston, J.) ("Where, as here, there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care, courts routinely

hold that compassionate release is not warranted.") (citing cases); *United States v. Gowdy*, -- F. App'x --, 2020 WL 7702579 (5th Cir. Dec. 28, 2020) (not precedential); *United States v. Syed*, 2020 WL 5995053, at *5 (M.D. Tenn. Oct. 9, 2020) (even after six months the CDC continues to state that hypertension only "might" present a risk; the court therefore "concludes that Defendant's hypertension does not constitute extraordinary and compelling reasons for his release."); *United States v. Thomas*, 2020 WL 3895781, at *3 (W.D. Va. July 10, 2020) ("During the pandemic, courts in this district and across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions."); *United States v. Colbert*, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020) ("Hypertension, a condition that affects about 46% of the U.S. adult population, high cholesterol, and having had prostate cancer in the past are not 'extraordinary and compelling' conditions.").

In sum, Richardson does not present a risk factor in relation to COVID-19, and he therefore does not present an "extraordinary and compelling reason" allowing consideration for compassionate release. And even if he did, relief should be denied.

This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See United States v. Doe*, -- F. App'x --, 2020 WL 6328203 (3d Cir. Oct. 29, 2020) (per curiam; not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in

considering the nature of the offense and the defendant's history, as well as the speculative risk of infection at a facility that presented only two positive cases).

At present, the defendant's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, he continues to present an economic danger to the community, and should be required to serve the sentence that this Court imposed for his criminal conduct. For two years, the defendant was a central participant in a nationwide scheme to defraud Walmart and a number of banks. Out of the nine charged conspirators, he was responsible for the third highest intended loss, approximately $597,000. This conduct took place over a period between two and four years ago, when the defendant was between the ages of 37 and 39, and suffering from several of the same conditions he presents today. In addition, the defendant has a significant record of criminal conduct, including the commission of crimes while on parole or supervised release.

The defendant fails to demonstrate how release, 20 months into a 70-month sentence for a serious fraud crime, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome

from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. A court recently accurately summarized: "The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020). *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Nunez*, 2020 WL 5237272, at *7 (E.D. Pa. Sept. 1, 2020) (Sanchez, C.J.) (release granted after 47 months of a 72-month term for drug and firearm offenses, "because Nunez presents a unique case in which he provided substantial assistance to authorities, shows significant rehabilitation, and faces an increased risk of severe illness" from obesity, tuberculosis, and gout); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense).

Courts have generally denied release in cases involving comparable crimes and sentences, even where, unlike here, the defendant presents a definite health risk related to COVID-19. *See, e.g.*, *United States v. Tartaglione*, 2020 WL 3969778, at *7 (E.D. Pa. July 14, 2020) (Slomsky, J.) (reduction of 82-month sentence, which itself was a downward variance, after two years, would be inappropriate, where the defendant committed a $2 million fraud against a public health clinic); *United States v. Hill*, 2020 WL 4431530 (E.D. Pa. July 31, 2020) (Kearney, J.) (57-year old presents obesity and heart disease, but he is a serial, career fraudster; relief denied with 25 months remaining on 60-month sentence), *reconsideration denied*, 2020 WL 4736032 (E.D. Pa. Aug. 13, 2020); *United States v. Edmonds*, 2020 WL 7364532, at *2 (E.D. Pa. Dec. 15, 2020) (Pappert, J.) (relief is denied because obesity with BMI of 36 (which has improved during his incarceration) is not sufficient; and in any event, he has served only half of a 60-month sentence for fraud committed as a VA official); *United States v. Brigham*, 2020 WL 5995188 (E.D. Cal. Oct. 9, 2020) (72-year-old suffers from numerous ailments and is eligible for consideration, but relief is denied 33 months into 60-month term for violation of supervised release because he is a "career con man"); *United States v. Lytle,* 2020 WL 4747609 (D.S.D. Aug. 17, 2020) (85-year-old is two years into 144-month sentence for scheme to market misbranded medical devices and suffers from many ailment; relief is denied, in part because he "was continuing criminal activity into his early eighties despite having those physical issues and was unrepentant"); *United States v. Van Sickle*, 2020 WL 2219496, at *5 (W.D. Wash. May 7, 2020) (while not yet resolving motion, the court observes that a history of fraud is a concern: "The court notes that, due to the economic

- 18 -

impacts of the COVID-19 pandemic, large segments of the public have recently suffered severe financial setbacks, unemployment, and other deprivations. These circumstances can lend themselves to even greater vulnerability to the very types of fraudulent schemes that Mr. Van Sickle has pursued in the past.").

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


/s Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


/s Mary E. Crawley
MARY E. CRAWLEY
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Arnold C. Joseph, Esq.
1801 Market Street, Suite 2500
Philadelphia, PA  19103

*/s Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

Dated:  January 14, 2021.